**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| FASCIA EDWARDS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 12 C 00371 |
| | ) | Hon. Marvin E. Aspen |
| ILLINOIS DEPARTMENT OF FINANCIAL | ) | |
| AND PROFESSIONAL REGULATION, *et al*., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

MARVIN E. ASPEN, District Court Judge:

Presently before us is a motion for summary judgment filed by Defendant Illinois Department of Financial and Professional Regulation ("IDFPR"), seeking judgment on Plaintiff Fascia Edward's ("Plaintiff") claims against it. Plaintiff alleges that Defendant discriminated against her on the basis of disability, age, race, and sex, and retaliated against her for reporting the alleged discrimination, in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621, Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. §§ 2000e *et seq*., and Section 504 of the Rehabilitation Act of 1973 ("the Rehabilitation Act"). For the reasons set forth below, we grant Defendant's summary judgment motion in part and deny it in part.

## FACTUAL BACKGROUND

We begin with the pertinent facts. Unless otherwise noted, the facts described herein are undisputed and culled from the parties' Local Rule 56.1 statements of fact and exhibits.

(*See* Def. Rule 56.1 Statement of Facts, (Dkt. No. 144) [*hereinafter* Def. SOF]; Pl. Rule 56.1 Statement of Facts, (Dkt. No. 159) [*hereinafter* Pl. SOF].)  To the extent that either party objected to certain statements of fact or exhibits, we shall rely on admissible evidence only for the purposes of our analysis.  *See, e.g.*, *Hemsworth v. Quotesmith Com., Inc.*, 476 F.3d 487, 490 (7th Cir. 2007) ("The evidence relied upon in defending a motion for summary judgment must be competent evidence of a type otherwise admissible at trial.").  We decline to address objections specifically unless warranted.

## I.    Facts

### a.  General Background

Plaintiff Fascia Edwards, an African-American female, began working at the Illinois Department of Financial and Professional Regulation ("IDFPR") on December 1, 2008 when she was transferred from the Illinois Department of Human Services in lieu of layoff. (Def. SOF ¶ 11.)  Plaintiff was a member of the AFSCME union and as a union member was entitled to a transfer to another union position in the case of agency layoffs.  (*Id*. ¶ 12.)  Plaintiff transferred to an Executive I position working in the IDFPR records room.  (*Id*. ¶ 11.)  Plaintiff's job duties included maintaining the public index, supervising the individuals in the file room, responding to requests from attorneys for files or documents, and responding to subpoenas. (*Id*. ¶ 14.)  When Plaintiff started at IDFPR, she was the working supervisor for temporary employees also assigned to the records room.  (*Id*. ¶ 18.)  Plaintiff's immediate supervisor was John Lagattuta ("Lagattuta"), a Chief Administrative Judge for IDFPR.  (*Id*. ¶ 10.)  As her immediate supervisor, Lagattuta was responsible for assigning and reviewing Plaintiff's work, preparing, conducting and signing performance evaluations, and recommending disciplinary action.  (*Id*.)  Lagattuta did not have the authority to hire, fire, demote, suspend or issue

discipline for Plaintiff.  (*Id.*)  Lagattuta was also not in charge of returning Plaintiff to work after

a leave of absence.  (*Id.* ¶ 77.)  Instead, human resources functions such as returns from leave

were delegated to Administrative and Regulatory Shared Services ("A & R Shared Services").

(*Id.* ¶ 8.)

### b.  *Plaintiff's Discipline at IDFPR*

Within the first month of her employment with IDFPR, Plaintiff received four charges[1] of

insubordination from Lagattuta.[2]  (*Id.* ¶ 29.)  She was disciplined for playing her radio without

headphones, for refusing to sit in her assigned work area, for sending an unauthorized email

unilaterally changing records room policies and for staying on IDFPR premises past 6:00 p.m.

(*Id.* ¶¶ 30–32, 42.)  Aside from these charges against Plaintiff, Lagattuta has never brought

disciplinary charges against any other employee throughout his career at IDFPR.  (*Id.* ¶ 9)

Plaintiff's union steward, Chuck Rocek ("Rocek"), testified that in his experience, he had never

seen an Executive I supervisor disciplined for the type of conduct Plaintiff was disciplined for.

(Pl. SOF ¶¶ 51–57.)  Along with these charges of insubordination, various employees in the

records room reported Plaintiff to Lagattuta[3] for allegedly inappropriate behavior throughout

December 2008.[4]  (*Id.* ¶¶ 35–39.)  On January 16, 2009, Lagattuta notified Plaintiff that

---

[1] Defendant alleges that Plaintiff was disciplined three additional times for making misrepresentations to Lagattuta.  (*Id.* ¶ 40.)  Plaintiff denies these allegations. (*See* Pl. Resp. Def. SOF ¶ 40.)

[2] Plaintiff denies Def. SOF ¶ 29, alleging that she was disciplined for insubordination on three separate occasions.  (*See* Pl. Resp. Def. SOF ¶ 29.)  However, Plaintiff admits each individual charge of insubordination in later SOF.  (*See id.* ¶¶ 30–32.)  We rely on Plaintiff's admissions in ¶¶ 30–32, not her denial in ¶ 29.

[3] Lagattuta instructed his workers that if anything unusual was going on they should make a note of it.  (Def. SOF ¶ 45.)  Lagattuta did not specifically instruct employees to monitor Plaintiff. (*Id.*)  Beginning in Plaintiff's first week of work, Lagattuta began recording her conduct.  (*Id.*)

[4] Defendant alleges that two individuals Plaintiff supervised in the records room requested to be removed from the records room due to Plaintiff's unprofessional conduct.  (*See id.* ¶¶ 21–22.) Plaintiff denies these allegations.  (*See* Pl. Resp. Def. SOF ¶¶ 21–22.)

discipline was being contemplated for conduct unbecoming of a State worker and for violations of the IDFPR Policy and Procedure Manual. (*Id*. ¶ 28.) On January 28, 2009, a pre-disciplinary hearing was held regarding Plaintiff's alleged misconduct. (*Id*. ¶ 47.) Plaintiff's union representative presented a rebuttal concerning the discipline recommended for Plaintiff on February 5, 2009. (*Id*. ¶ 49.) Four days later, Plaintiff requested disability leave, tolling the time to issue any discipline following a pre-discipline hearing. (*Id*. ¶ 51.) After Plaintiff's leave terminated on June 26, 2009, Lagattuta recommended a three-day suspension for Plaintiff. (*Id*. ¶ 52.) On July 1, 2009, Plaintiff was served with her three-day suspension, left early that day, and never returned to work at IDFPR. (*Id*. ¶¶ 53–54.)

### c. *Plaintiff's Hostile Work Environment Claims*

Just three days into Plaintiff's employment at IDFPR, a temporary employee in the records room, Brad Egger ("Egger"), arranged magnets on the records room door that spelled "REDRUM." (*Id*. ¶ 58.) Plaintiff alleges that she removed the magnets once and Egger replaced the magnets by spelling "REDRUM" again. (Pl. Decl., Pl. Ex. 11 (Dkt. No. 172–1) ¶ 7.) Plaintiff interpreted "REDRUM" as a threat; "redrum" spells "murder" backwards. (Edwards Dep. (Dkt. No. 144–1) at 127.) Plaintiff believed Egger was directing the message at her because she was the only African-American female supervisor in the records room. (Def. SOF ¶ 56.) Plaintiff reported this incident to Lagattuta and requested that Egger be removed from the records room. (*Id*. ¶ 62.) Edwards met with her union representative and IDFPR general counsel on December 8, 2008, was informed that Egger had been removed from the records room, and was told to contact general counsel if she had any more problems. (*Id*. ¶ 61.) Egger wrote a statement concerning the incident; Eggers said that he thought the word "REDRUM" came from a book about a guy who as a little bit crazy and that Eggers did not aim

the message towards anyone. (Def. SOF ¶ 59.) On December 8, 2008, Lagattuta requested that Edwards write up the incident and come in to meet with Lagattuta. (*Id*. ¶ 62.) Edwards emailed Lagattuta a statement on December 30, 2008. (*Id.*) In her statement, Edwards acknowledged that IDFPR conducted and completed an investigation into the incident. (*Id.*) Edward's statement did not include any complaints regarding discrimination. (*Id.*) Despite being removed from the records room, Plaintiff alleges that Egger continued to visit the records room and that she continued to feel unsafe in the records room even after Egger was removed. (Pl. SOF ¶¶ 45, 76.) Defendant, on the other hand, alleges that Plaintiff indicated that she did not need to be removed from the records room as a result of the Egger's incident and that as of January 12, 2009, Plaintiff acknowledged that there were no racial tensions in the records room. (Def. SOF. ¶¶ 63, 66.) It is undisputed that when asked if she would like to sit in a separate area from those she supervised, Plaintiff indicated that she would remain in the records room because "the trouble source [was] moved." (*Id*. ¶ 63.)

Along with the "REDRUM" incident, on January 13, 2009, Lagattuta learned that a second temporary worker in the records room, Stephanie Berliant ("Berliant"), had made three disparaging remarks about Plaintiff, including calling her "crazy." (Def. SOF ¶ 67.) Lagattuta investigated these allegations and found that the comments did not warrant discipline. (*Id*. ¶ 68.)

Months later, in June 2009, Plaintiff reported "work-place safety" concerns to Carolyn Hodge Brown, Deputy Chief of Staff for Governor Pat Quinn. (*Id*. ¶ 70.) Ms. Hodge informed Plaintiff that she should contact her EEO officer with these concerns. (*Id.*) The parties dispute whether Plaintiff contacted her EEO officer. (*See id.*; Pl. Resp. Def. SOF ¶ 69.)

In a July 1, 2009 email to Lagattuta, Plaintiff requested to be relocated from the records room because she claimed: (1) she did not feel safe in the records room; (2) she was previously

injured in the records room; and (3) she was uncomfortable with Egger visiting the area and felt that she was being subjected to a hostile work environment. (*Id.* ¶ 70.)

### d. Plaintiff's Back Injury and Request for Accommodation

On June 22, 2009, Plaintiff suffered a back injury on the job from allegedly lifting heavy binders and boxes. (*Id*. ¶ 72.) Plaintiff immediately sought emergency medical attention and was diagnosed with a herniated disk. (*Id*.) Plaintiff's physician, Dr. Pompilia Tudoriu ("Tudoriu"), released Plaintiff to work on June 24, 2009. (*Id.* ¶ 73.) On July 8, 2009, Plaintiff requested ordinary disability for authorized leave until notification was received from workman's compensation. (*Id*. ¶ 80.) Attached to the request, Dr. Tudoriu submitted a physician's statement on Plaintiff's behalf indicating that Plaintiff was permanently and totally disabled from employment and incapable of minimal sedentary activity. (*Id*.) Plaintiff's leave was approved and she was informed that she was expected to return on August 9, 2009 with a statement signed by her physician that she was cleared to return without limitation. (*Id*. ¶ 81.) Defendant alleges that Plaintiff was informed that if she wished to receive a reasonable accommodation, she should complete a "Reasonable Accommodation Request." (*Id.*) Plaintiff denies this allegation. (*See* Pl. Resp. Def. SOF ¶ 81.)

On August 6, 2009, days before Plaintiff's initial leave was set to expire, Dr. Tudoriu submitted a second letter to human resources stating that Plaintiff was no longer permanently and totally disabled from any employment, but was still temporarily totally disabled from her current occupation. (*Id*. ¶ 82.) The note also indicated that Plaintiff had severe limitations of functional capacity and was incapable of all sedentary activity. (*Id*. ¶ 82.)

Plaintiff's leave was subsequently extended on August 10, 2016 and set to expire on October 9, 2009. (*Id*. ¶ 83.) Like in response to Plaintiff's first request for leave, Defendant

alleges that Plaintiff was informed that if she required accommodation, she should file a request along with the appropriate paperwork. (*Id*.) Plaintiff again denies these allegations. (*See* Pl. Resp. Def. SOF ¶ 83.) Plaintiff extended her leave for a second time on October 5, 2009. (Def. SOF ¶ 84.) She informed the human resources department that she was unable to return to work on October 9, 2009 and would be continuing therapy, per her doctor's orders. (*Id*.) Two weeks later, on October 20, 2009, Dr. Tudoriu submitted a physician's statement saying that Plaintiff was permanently and totally disabled from her regular occupation. (*Id*. ¶ 85.)

On October 15, 2009, Plaintiff requested an Alternative Employment Program ("AEP") application. (*Id*. ¶ 99.) AEP is a program administered by the Department of Central Management Services to find alternative employment for employees on approved leave which permanently and totally precludes them from their current position.[5] (*Id*. ¶ 94; Decl. Jaci Debrun, Def. Ex. 38 (Dkt. No. 144–3).) As a part of her application, Plaintiff signed a "Reasonable Accommodation Certification," that stated she was on disability leave and was unable to return to her position of Executive I Supervisor because of her disability. (*Id*. ¶ 100.) At the bottom of the form, Plaintiff noted "As of 10-29-09, [n]o full time, lateral position offered to me nor any consultation conducted with me by ADA Coordinator. Please contact by email or phone to schedule ADA interview." (Def. Ex. 42 (Dkt. No. 144–3).) Defendant contends that by signing this form, Plaintiff acknowledged that accommodation at the Executive I position was attempted and deemed not plausible. (Def. SOF ¶ 100.) Plaintiff argues that she signed the form simply because it was required for admission to AEP and denies that she was offered

---

[5] Plaintiff objects to Def. SOF ¶ 94 concerning AEP and cites a portion of the deposition of Susan Gold, Senior Deputy General Counsel for IDFPR. (*See* Pl. Resp. Def. SOF ¶ 94.) The cited deposition (*see* Dkt. No. 172–12 at 1), does not contradict Def. SOF ¶ 94, so we accept Def. SOF ¶ 94 as unopposed.

accommodation by IDFPR, as evidenced by her note at the bottom of the page. (Edwards Dep. at 271–72.) Defendant argues that the "Reasonable Accommodation Certificate" is not a general request for accommodation but specifically applies to a request for accommodation through AEP. (Def. SOF ¶ 100.) Plaintiff was admitted into AEP on July 9, 2008. (*Id.* ¶ 101.) Plaintiff alleges that after being admitted into AEP, her doctor authorized her return to the Executive I position in June 2010, September 2010 and October 2010. (*Id.* ¶ 102.) In Dr. Tudoriu's July 17, 2010 physician's statement, Dr. Tudoriu noted that "patient may return to work with accommodation." (*See* Dkt. No. 172–2 at 3.) Defendant has submitted inconsistent testimony concerning whether a doctor, as opposed to an employee, may request a reasonable accommodation for a patient. (*See* Gold Dep. (Dkt. No. 172–11) at 15:11–15; Kirk Dep. (Dkt. No. 144–2) at 101:5–7.) Plaintiff was not provided a position or income through AEP. (Pl. Decl. ¶ 11.)

### e.  Plaintiff's Union Grievances and Charges of Discrimination

In February 2009, Plaintiff filed a union grievance related to her job duties in the records room, specifically alleging that Lagattuta altered her job duties. (Def. SOF ¶ 25; Def. Ex. 14 (Dkt. No. 144–3).) Her union grievance does not allege discrimination or mention that she was required to engage in heavy lifting. (*See* Def. Ex. 14.)

Plaintiff filed three charges of discrimination with the EEOC. Plaintiff filed her first charge on February 9, 2009 alleging discrimination, hostile work environment and retaliation based on race and sex. (Def. SOF ¶ 103.) Plaintiff did not allege disability discrimination in her February 2009 charge. Plaintiff amended her initial charge on September 29, 2011, alleging that in retaliation for her February 2009 complaint, her wages had been docked and she had been denied reinstatement following disability leave. (*Id.* ¶ 104.) Plaintiff filed a second EEOC

charge on October 11, 2011, this time alleging disability discrimination, age discrimination and retaliation under the ADA and ADEA. (*Id.* ¶ 105.) Plaintiff alleged that Defendant failed to reinstate her due to her age and disability but did not state that Defendant failed to provide a reasonable accommodation. (*Id.* ¶ 105; Def. Ex. 45 (Dkt. No. 144–3).)

## STANDARD OF REVIEW

Summary judgment is proper only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue for trial exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986). The standard places the initial burden on the moving party to identify those portions of the record that "it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986) (internal quotations omitted). Once the moving party meets this burden of production, the nonmoving party "must go beyond the pleadings" and identify portions of the record demonstrating that a material fact is genuinely disputed. *Id.*; Fed. R. Civ. P. 56(c).

In deciding whether summary judgment is appropriate, we must accept the nonmoving party's evidence as true and draw all reasonable inferences in that party's favor. *Anderson*, 477 U.S. at 244, 106 S. Ct. at 2513. We do not "judge the credibility of the witnesses, evaluate the weight of the evidence, or determine the truth of the matter. The only question is whether there is a genuine issue of fact." *Gonzalez v. City of Elgin*, 578 F.3d 526, 529 (7th Cir. 2009) (citing *Anderson*, 477 U.S. at 249–50, 106 S. Ct. at 2511). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Sarver v. Experian Info. Sols.*, 390 F.3d 969, 970 (7th Cir. 2004) (citation omitted).

## ANALYSIS

Plaintiff alleges discrimination under the ADA, ADEA, Title VII and the Rehabilitation Act. To proceed under all four federal statutes, a plaintiff must first file a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") within 300 days of the offending conduct. Accordingly, we first consider whether Plaintiff's claims are properly before us before continuing on to analyze the merits of any remaining federal claims.

## I.    Exhaustion of Administrative Remedies

In Illinois, an individual complaining of discriminatory conduct under the ADA, ADEA, Title VII or the Rehabilitation Act, must file a complaint with the EEOC within 300 days of the alleged unlawful conduct. *See* 42 U.S.C. § 2000e–5(e); *see also Hentosh v. Herman M. Finch Univ. of Health Servs.*, 167 F.3d 1170, 1173 (7th Cir. 1999); *see also Snider v. Belvidere Township*, 216 F.3d 616, 618 (7th Cir. 2000) (affirming district court's finding that plaintiff's Title VII claim was time-barred when the complaint was not filed with the EEOC within 300 days); *Flannery v. Recording Indus. Ass'n of Am.*, 354 F.3d 632, 637 (7th Cir. 2004) (applying the same 300 day time period to claims brought under the ADEA and ADA); *Teal v. Potter*, 559 F.3d 687, 691 (7th Cir. 2009) (holding that claims brought under the Rehabilitation Act are subject to the exhaustion requirements outlined in Title VII). Failure to do so renders the complaint untimely and the claimant is precluded from bringing an action in court "unless the claim is reasonably related to one of the EEOC charges and can be expected to develop from an investigation into the charges actually raised." *Green v. Nat. Steel Corp., Midwest Div.*, 197 F.3d 894, 897 (7th Cir. 1999).

### a.    *Plaintiff's ADA Claims*

Defendant argues that Plaintiff's ADA claims should be dismissed because they are

untimely and because Plaintiff's reasonable accommodation claim was not included in her EEOC charge.  (Mem. ISO MSJ (Dkt. No. 143) at 3–5.)

### i.  Timeliness of ADA Claim

Defendant asserts that the alleged discriminatory act triggering Plaintiff's ADA claim, denial of reinstatement, occurred more than 300 days prior to the filling of her EEOC charge. (Mem. ISO MSJ at 4.)  Defendant alleges that Plaintiff claims she could have been rehired on October 2010, more than 300 days prior to her charge.  (*Id.*)  Plaintiff argues that she continued to seek reemployment with Defendant via physician's statements from her doctor through July 17, 2010.  (Resp. (Dkt. No. 164) at 4.)  Based on this conflicting testimony, we find that there is a genuine issue of material fact as to when the alleged discriminatory act occurred, and thus, we may not dispose of Plaintiff's claims at this stage.  *Flannery*, 354 F.3d at 641.

### ii.  Scope of EEOC Charge

Having addressed Defendant's timeliness argument, we next consider whether Plaintiff's ADA claim is foreclosed for failure to include it in her EEOC charge.  In her October 11, 2011 EEOC charge, Plaintiff stated: "I believe I have been discriminated against because of my disability, and in retaliation," in violation of the ADA.  (*See* Def. Ex. 45 (Dkt. No. 144–3).)  In the October 11 charge, Plaintiff also alleges that "Respondent has refused to reinstate me."  (*Id.*) Nowhere does Plaintiff state that she was denied a reasonable accommodation.

Courts in this circuit are clear: a claim for failure to accommodate is separate and distinct under the ADA from a disability discrimination claim.  *Weigel v. Target Stores*, 122 F.3d 461, 464 (7th Cir. 1997); *Green*, 197 F.3d at 897; *Giovanni v. Megabus USA, LLC*, No.14 C 3195, 2015 WL 6449133, at *4 (N.D. Ill. Oct. 23, 2015).  Plaintiff does not deny that she did not explicitly articulate a failure to accommodate claim in her EEOC charge.  (*See* Resp.

at 9.)  Instead, she argues that Plaintiff "could expect that the reasonable accommodation issue would be investigated as an outgrowth of her claim that respondent had refused to reinstate her." (*Id*.)  Whether or not a reasonable accommodation claim is sufficiently related to a discrimination claim turns on the circumstances surrounding the failure to accommodate claim. *See Davis v. Am. Drug Stores*, No. 01 C 3704, 2003 WL 21149063, at \*3 (N.D. Ill. May 19, 2003) (holding that failure to accommodate and disability discrimination claims were "inextricably intertwined" because "the decision to discharge plaintiff was, in effect, a refusal to provide her the accommodation" she requested); *Ortiz v. Bd. of Educ. of City of Chi.*, No. 11 C 9228, 2013 WL 3353918, at \*5 (N.D. Ill. July 2, 2013) (denying defendant's motion to dismiss for failure to exhaust administrative remedies because it was "not unreasonable to think an investigation into [plaintiff's] termination would grow into an investigation of the alleged failure to provide a reasonable accommodation); *Morales v. Goodwill Indus. of Se. Wisconsin, Inc.*, No. 14 C 2370, 2014 WL 4914255, at \*4 (N.D. Ill. Sept. 30, 2014) (finding that plaintiff's failure to accommodate claim was reasonably related to her EEOC disability discrimination charge because defendant's alleged failure to accommodate caused plaintiff to be terminated). Here, although Plaintiff did not include the words "reasonable accommodation" in her EEOC charge, we find that an investigation into her claims that she was not rehired due to her disability would have revealed her reasonable accommodation claim.  *Davis*, 2003 WL 21149063, at \*3; *Ortiz*, 2013 WL 3353918, at \*5; *Morales*, 2014 WL 4914255, at \*4.  Accordingly, Plaintiff's ADA claims survive an exhaustion analysis.

### b.  Plaintiff's ADEA Claims

Defendant additionally alleges that Plaintiff's ADEA claims are untimely because the alleged discriminatory conduct, Defendant replacing Plaintiff with a younger employee, occurred

more than 300 days prior to Plaintiff's EEOC charge. (Mem. ISO MSJ at 4.) We agree with Defendant.

In her complaint, Plaintiff alleges that Defendant violated the ADEA when her job was "assigned to a younger worker while Plaintiff was given the work of a file clerk." (Compl. (Dkt. No. 44) ¶ 39.) In her deposition, Plaintiff reaffirmed that allegation and identified the individual, Stephanie Berliant, who was allegedly given Plaintiff's job duties. (Edwards Dep. (Dkt. No. 144–1) at 103.) Based on both Plaintiff's complaint and her deposition testimony, Plaintiff alleges one discrete discriminatory act to support her ADEA claim: Defendant replacing her with Stephanie Berliant.[6] (*See* Compl. ¶ 39; Edwards Dep. at 103.)

Plaintiff argues that while staffed in the records room at IDFPR, Lagattuta changed Plaintiff's job to a file clerk and reassigned Plaintiff's original duties to Berliant. (Edwards Dep. at 97–100.) Plaintiff's last day in the records room was July 1, 2009. (Def. SOF ¶ 53.) Plaintiff filed her EEOC charge alleging age discrimination on October 11, 2011. (October 11 EEOC Charge.) Accordingly, at the very latest, Stephanie Berliant replaced Plaintiff on July 1, 2009, more than 300 days prior to Plaintiff filing her EEOC charge. Plaintiff's ADEA claim is untimely. Defendant's motion is granted as to Count II.[7]

---

[6] We note that in her complaint and deposition, Plaintiff also alleges that other similarly situated, younger employees were treated more favorably than Plaintiff. (*See* Compl. ¶ 39; Edwards Dep. at 101–03.) However, in her deposition, Plaintiff makes clear that these younger employees, with the exception of Stephanie Berliant, were not assigned her job duties and were supervised by Plaintiff throughout her time at IDFPR. (Edwards Dep. at 103.) Accordingly, we find that Chris Falcone, Jonathan Yorker, Stephanie Picinich, Audrey Edwards, Patricia Koziel and Charlotte Tybor were not similarly situated employees. *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 802 (6th Cir. 1994) (holding that a supervisor was not similarly situated to a non-supervisor). Because Plaintiff only identifies one potentially similarly situated individual (we do not decide here if Berliant is similarly situated), we focus on that allegation that Defendant violated the ADEA by replacing her with Berliant.

[7] Plaintiff's ADEA claim fails under a merits analysis as well. Plaintiff has failed to present sufficient evidence to permit a jury inference that she was discriminated against based on her age

### c. *Plaintiff's Retaliation Act Claims*

Finally, Defendant asks that we enter judgment on Plaintiff's Rehabilitation Act claims because they are untimely. (Mem. ISO MSJ at 6.) Like Plaintiff's ADA claims, we find that there is a genuine issue of material fact as to when the alleged retaliation occurred,[8] so we decline to grant Defendant's motion now. *Flannery*, 354 F.3d at 641.

## II.    **Plaintiff's Claims on the Merits**

Because Plaintiff exhausted administrative remedies for her ADA, Title VII and Rehabilitation Act claims, we consider the merits of those claims in turn.

### a. *Discrimination Based on Disability (ADA and The Rehabilitation Act)*

Plaintiff alleges that Defendant discriminated against her due to her disability in violation of the ADA and the Rehabilitation Act when Defendant: (1) failed to reinstate or rehire her; and (2) failed to provide her with a reasonable accommodation. (Compl. ¶¶ 31, 32.) The ADA and Rehabilitation Act have the same standards, except the Rehabilitation Act includes as an additional element the receipt of federal funds by the defendant. *Jaros v. Ill. Dep't of Corr.*, 684 F.3d 667, 671–72 (7th Cir. 2012) (stating that for a failure to accommodate claim the same standard is applied under the ADA and the Rehabilitation Act, "except that the Rehabilitation Act includes as an additional element the receipt of federal funds"). As Defendant notes,

---

when certain job responsibilities were given to Berliant. Berliant is not a union worker, thus, not a proper comparator. (*See* Def. SOF ¶ 110; *Birks v. YRC, Inc*., No. 13 C 9296, 2015 WL 394097, at *5 (N.D. Ill. Jan. 29, 2015) (finding that non-unionized employees were not similarly situated to unionized Plaintiff).)

[8] Defendant again argues that at the latest, the alleged retaliation occurred in October 2010 when Plaintiff claims she was eligible to be rehired. (Mem. ISO MSJ at 6.) Plaintiff alleges that the retaliation was ongoing when Defendant refused to rehire Plaintiff despite physician certificates requesting accommodation as late as July 2014. (Resp. at 4.)

Plaintiff has failed to present any evidence[9] that Defendant received federal funds, so her Rehabilitation Act claims must fail. *Murphy v. Vill. of Hoffman Estates*, No. 95 C 5192, 1999 WL 160305, at *8 (N.D. Ill. Mar. 17, 1999) (affirming summary judgment on Rehabilitation Act claim where plaintiff failed to raise a triable issue as to whether defendant received federal funding); *Brewer v. Wis. Bd. of Bar Examiners*, No. 4 C 694, 2006 WL 752922, at *5 (E.D. Wisc. Mar. 22, 2006) ("Because plaintiff has failed to show that [defendants] receive federal financial assistance, defendants are entitled to summary judgment on plaintiff's Rehabilitation Act claim.")

We continue, then, with Plaintiff's ADA claims. The Americans with Disabilities Act prohibits employers from discriminating against "a qualified individual because of [her] disability." 42 U.S.C. § 12112(a); *Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 502 (7th Cir. 2004). Under the ADA, to succeed on a disability discrimination claim, Plaintiff must prove that (1) she was disabled within the meaning of the ADA, (2) she is qualified to perform the essential functions of the job, with or without reasonable accommodations, and (3) Defendant took an adverse employment action against her because of his disability or without making a reasonable accommodation for it. *Basden v. Prof'l Transp., Inc*., 714 F.3d 1034, 1037 (7th Cir. 2013).

---

[9] Plaintiff argues that we may take judicial notice that Defendant receives federal funding and attaches a press release from IDFPR concerning a program sponsored by IFDRP that receives federal funding. (*See* Resp. at 30; Pl. Ex. 38 (Dkt. No. 174–2).) Based on our review of this press release, the document at the most shows that the Illinois Senior Health Insurance Program (SHIP), a program sponsored by IDFPR, received federal funding. (*See* Pl. Ex. 38.) We fail to see how this document allows us to "accurately and readily determine" that Defendant receives federal funding. *See* Fed. R. Evid. 201.

i.  <u>Otherwise Qualified</u>

Defendant alleges that summary judgment is proper because Plaintiff was not a qualified individual.  (Mem. ISO MSJ at 19.)  According to Defendant, Plaintiff's physician's statements labeling Plaintiff as "totally disabled," disqualify her from ADA protections.  (*Id.* (citing *Weigel*, 122 F.3d at 467–68).)  While we agree with the proposition in *Weigel* that, "[w]hen [physicians] represent that [plaintiff is] 'totally disabled,'[or]'wholly unable to work,' . . . employers and factfinders are entitled to take them at their word;" we find that Dr. Tudoriu's multiple physician notes raise a genuine issue of material fact as to whether Plaintiff was labeled as "totally disabled."  Dr. Tudoriu submitted at least three notes to IDFPR[10] and A & R Shared Services concerning Plaintiff's injury and current work capacity.  (*See* Def. Exs. 29, 32, 34 (Dkt. No. 144–3).)  While initial reports from July 2009 indicated that Plaintiff was "permanently and totally disabled from employment," (Def. Ex. 29), Dr. Tudoriu's September 16, 2009 statement reported that Plaintiff was no longer "permanently and totally disabled from employment,"[11] (Def. Ex. 32).  In her deposition, Dr. Tudoriu testified that as of the September 16 letter, she believed Plaintiff could return to work with reasonable accommodation.[12]  (Tudoriu Dep. (Dkt. No. 144–3) at 27.)  We find that the September 16 letter

---

[10] Defendant alleges that IDFPR did not receive any reports from Dr. Tudoriu.  Plaintiff disagrees.  Because we cannot make credibility determinations at the summary judgment phase, whether or not Defendant received Dr. Tudoriu's reports is a question better left to a jury.  *Gonzalez*, 578 F.3d at 529.

[11] In the August 16, 2009 and June 17, 2010 reports, Dr. Tudoriu also checks a box indicating that Plaintiff is "temporarily totally disabled" from Plaintiff's regular occupation.  (*See* Def. Exs. 32, 34.)

[12] In June 6, 2010, Dr. Tudoriu submitted a second physician's certificate noting that "patient has improved," but this time certifying that Plaintiff was "permanently and totally disabled" from her regular occupation.  (Def. Ex. 34.)  Again, we make no credibility determinations; a jury must decide whether Dr. Tudoriu's June letter nullified her September 16 letter.  *Gonzalez*, 578 F.3d at 529.

and related deposition testimony preclude judgment based on the "otherwise qualified" prong of our analysis.

Defendant additionally argues that by applying to the AEP program, Plaintiff certified that she was no longer qualified for the Executive I position at IDFPR. (Mem. ISO MSJ at 19.) While Plaintiff admits that she signed the required application materials for the AEP program, including a "Reasonable Accommodation Certificate," (Def. SOF ¶ 100), she denies that her signature admitted that she was not qualified for the Executive I position. (Edwards Dep. at 299–301.) Instead, she argues that she applied to AEP and signed all the required documentation because Defendant refused to reinstate her or accommodate her disability. (*Id*. at 296.) We find that there is a genuine issue of material fact as to whether Plaintiff's application to AEP proves she was not "otherwise qualified."

ii. <u>Discrimination on the Basis of the Disability</u>

Defendant next argues that even if Plaintiff was "otherwise qualified" she has failed to prove that she was discriminated against based on her disability. "Discrimination" under the ADA includes both "not making reasonable accommodations" and "denying employment opportunities" on the basis of a disability. 42 U.S.C. § 12112(b)(5)(A)–(B). Plaintiff alleges both forms of discrimination.

1. Failure to Accommodate

According to Plaintiff, Defendant refused to reasonably accommodate her return to work after her disability leave. (Compl. ¶ 30.) To survive summary judgment on a failure to accommodate claim, a plaintiff must point to evidence that, if believed by a jury, would demonstrate that: "(1) [she] is a qualified individual with a disability; (2) [her] employer was aware of the disability; and (3) [her] employer failed to reasonably accommodate that disability."

*Reeves ex rel. Reeves v. Jewel Food Stores, Inc.*, 759 F.3d 698, 701 (7th Cir. 2014) (citing

*Ekstrand v. Sch. Dist. of Somerset*, 583 F.3d 972, 975 (7th Cir. 2009)). Having already

determined that there is a genuine issue of material fact as to Plaintiff's qualifications for the

Executive I position, we turn to the second and third elements of our analysis.

First, Defendant alleges that it was not aware of Plaintiff's disability since "she never

sent the Department any physician's statements or discussed her return to work with anyone at

the Department." (Mem. ISO MSJ at 20.) We believe that this argument goes to whether

Plaintiff requested a reasonable accommodation, not to Defendant's knowledge of Plaintiff's

disability. To the extent that Defendant is alleging that it did not know Plaintiff was disabled, we

find that assertion unsupported by the record. Plaintiff suffered a workplace injury at IDFPR and

immediately sought medical treatment during the workday. (Def. SOF ¶ 72.) Plaintiff then

requested, and was granted, disability leave from her IDFPR position through A & R Shared

Services.[13] (*Id.* ¶¶ 79–80.) Based on this information alone, we believe that a reasonable juror

could find that Defendant was aware of Plaintiff's disability. Additionally, the record also

supports a jury finding that Plaintiff did provide Defendant with copies of her physician's

statements. In her deposition, Plaintiff testified that in 2014, she sent a letter requesting

reasonable accommodation to Manuel Flores at IDFPR. (Edwards Dep. at 301.) Plaintiff also

testified that her doctor sent multiple reports to Defendant seeking reasonable accommodation

for her disability from June 2010 to July 2010. (*See* Pl. Exs. 1, 2, 8.)

After finding that Plaintiff has satisfied the first two elements of her reasonable

accommodation claim, we consider whether Defendant failed to provide Plaintiff a reasonable

accommodation. After making an employer aware of a disability and requesting an

---

[13] Susan Gold also testified that any requests for accommodation made to A & R Shared Services are passed along to Defendant. (Gold Dep. at 16.)

accommodation, "the ADA requires the employer to engage with [plaintiff] in an 'interactive process' to determine the appropriate accommodation under the circumstances." *EEOC v. Sears, Roebuck, and Co.*, 417 F.3d 789, 804 (7th Cir. 2005). Accordingly, to survive a motion for summary judgment, Plaintiff must present evidence that she requested an accommodation, triggering the "interactive process." *Jovanovic v. In–Sink–Erator Div. of Emerson Elec. Co.*, 201 F.3d 894, 899 (7th Cir. 2000); *Sears, Roebuck, and Co.*, 417 F.3d at 803. After triggering the interactive process, the employer must work with the employee "to determine the extent of the disability and what accommodations are appropriate and available." *Sears, Roebuck, and Co.*, 417 F.3d at 804.

Defendant argues that summary judgment is proper on Plaintiff's failure to accommodate claim because Plaintiff received the accommodation she requested: placement in AEP. (Mem. ISO MSJ at 20.) Defendant also argues that by applying to AEP, Plaintiff admitted that no reasonable accommodations existed at IDFPR. (*Id.*)

Because Defendant does not raise it, we need not consider whether Plaintiff requested a reasonable accommodation. *See D.S. v. E. Porte Cty. Sch. Corp.*, 799 F.3d 793, 800 (7th Cir. 2015) (arguments not raised in a motion for summary judgment are waived). Regardless of Defendant's waiver, we find that the record raises a triable jury question as to whether Plaintiff requested an accommodation to return to her Executive I position at IDFPR based on Plaintiff and Dr. Tudoriu's testimony that Dr. Tudoriu sent documentation requesting accommodation to Defendant, and that Plaintiff contacted Manuel Torres concerning her accommodation. (*See* Pl. Exs. 1, 2, 8; Edwards Dep. at 301.) Additionally, we find that Plaintiff's note on the bottom of her AEP application asking the ADA coordinator to contact her could allow a jury to infer she was requesting an accommodation from Defendant at that time.

(*See* Def. Ex. 42.)

We are also unpersuaded by Defendant's claim that Plaintiff received her requested accommodation through AEP.  First, Plaintiff was never assigned a position through AEP. (Pl. Decl. ¶ 11.)  Also, Plaintiff's testimony and the testimony of Dr. Tudoriu creates a genuine of material fact as to whether Plaintiff requested an accommodation to return back to IDFPR. (*See* Pl. Exs. 1, 2, 8; Edwards Dep. at 301.)  We believe that a reasonable jury could conclude that Plaintiff requested an accommodation from IDFPR, not through AEP, and that Defendant refused to consider such accommodation.  Accordingly, we deny Defendant's motion for judgment on Plaintiff's reasonable accommodation claim.

### 2.   Failure to Reinstate/Rehire

Defendant asks that we grant its motion on Plaintiff's failure to reinstate or rehire claim because Plaintiff failed to offer direct or indirect proof that Defendant did not rehire Plaintiff due to her disability.  (Mem. ISO MSJ at 21.)

In *Ortiz v. Werner Enter. Inc*., —F.3d—, 2016 WL 4411434 (7th Cir. Decided Aug. 19, 2016), the Seventh Circuit removed the direct versus indirect evidence distinction from our employment discrimination analysis.  Now, courts in this circuit must consider "simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's . . . proscribed factor caused the discharge or other adverse employment action."  *Id*. at 9.  We must "stop separating 'direct' from 'indirect' evidence" and instead focus on the "sole question that matters: Whether a reasonable juror could conclude that [plaintiff] would have kept [her] job if [s]he [was not disabled], and everything else had remained the same."  *Id.* at 6; *see also Castro v. DeVry Univ., Inc*., 786 F.3d 559, 564 (7th Cir. 2015) (finding that whether the court applies a formal "direct" method of proof analysis or "just cut[s] to the

chase and ask[s] the fundamental question directly—could a reasonable trier or fact infer [discrimination]?—makes no difference").

Based on the record, we do not believe that a reasonable jury could infer that Defendant failed to rehire Plaintiff because of her disability.  Plaintiff alleges that she has presented evidence that similarly situated, non-disabled individuals, Sadzi Oliva and Charlotte Tybor, were rehired after taking leave.  (Resp. at 14.)  While evidence that a similarly situated non-disabled employee was rehired can support an inference of disability discrimination, "the proposed comparator must be similar enough to permit a reasonable juror to infer, in light of all the circumstances, that an impermissible animus motivated the employer's decision." *Good v. Univ. of Chi. Med. Ctr.*, 673 F.3d 670, 675 (7th Cir. 2012).  Plaintiff provides minimal support for her ADA similarly situated argument, stating only that "Edwards can establish that similarly situated non-disabled employees were allowed to return to leave," and cites back to her similarly situated argument related to her Title VII claims.  (Resp. at 30.)  When discussing her Title VII claims, Plaintiff states that Sadzi Oliva returned to work following maternity leave and Charlotte Tybor returned to work after her administrative leave expired.  (*See* Pl. Ex. 7 (Dkt. No. 172–11).)  Plaintiff presents no evidence as to the disability status (or lack thereof) of her alleged comparators, so we cannot conclude that Oliva and Tybor were non-disabled employees. *See Andrews v. City of Chi.*, 836 F. Supp. 2d 696, 700 (N.D. Ill. 2011) (finding that Plaintiff failed to allege a prima facie case of disability discrimination when she failed to introduce evidence of the disability status of her proposed comparators).  Additionally, Plaintiff admits that her disability was a "very side issue" and that the reason she was not reinstated was "based on [her] race and [her] sex, and that's why they didn't want [her] there."  (Def. SOF ¶ 57.)  Because Plaintiff has failed to provide sufficient evidence for a jury to infer discriminatory intent, Defendant's motion

as to Plaintiff's ADA disability discrimination claim is granted.

### 3. Retaliation under the ADA

Lastly, Plaintiff alleges that Defendant retaliated against her on the basis of her disability when it refused to rehire her or provide her with an accommodation. (Compl. ¶ 29.) The ADA protects disabled plaintiffs from retaliation for asserting their ADA rights. *Dickerson v. Bd. of Trustees of Comm. Coll. Dist. No. 522*, 657 F. 3d 595, 600–01 (7th Cir. 2011). To state a claim for retaliation under the ADA, or Title VII, as will be addressed below, a plaintiff must allege: "1) that [s]he engaged in a statutorily protected activity; 2) that [s]he suffered an adverse employment action; and 3) that there was a causal link between the protected activity and the employer's action. *Prince v. Ill. Dep't of Revenue*, 73 F. Supp. 3d 889, 894 (N.D. Ill. 2010) (citing *McClendon v. Ind. Sugars, Inc.*, 108 F.3d 789, 796 (7th Cir.1997)).

In her complaint, Plaintiff alleges that Defendant "took retaliatory action against her prohibited by the ADA." (Compl. ¶ 29.) In her response to Defendant's motion for summary judgment, Plaintiff "reasserts the arguments she presented in support of her ADA failure to accommodate claim" to support her retaliation claim. (Resp. at 30.) In her deposition, Plaintiff again asserts that she bases her ADA retaliation claim on her request for accommodation. (*See* Edwards Dep. 93.) Accordingly, we analyze Plaintiff's retaliation claim based on the protected activity of seeking an accommodation. *Silk v. City of Chi.*, 194 F.3d 788, 800–01 (7th Cir. 1999) (finding that requesting a reasonable accommodation is a protected activity under the ADA); *Contreras v. Suncast Corp.*, 237 F.3d 756, 765 (7th Cir. 2001) (holding that an employer may not retaliate against an employee for requesting an accommodation); *Zachary M. v. Bd. of Educ. of Evanston Tp. High Sch. Dist. No. 202*, 829 F. Supp. 2d 649, 663 (N.D. Ill. 2011) ("The ADA proscribes retaliation for protected activities such as seeking

accommodations.").

Plaintiff has presented sufficient evidence that she engaged in a protected activity by requesting an accommodation.[14]  We next consider whether Defendant's refusal to rehire her constitutes an adverse employment action.  We find that it does.  "[A]n employer's refusal to hire or rehire an applicant is a classic adverse action . . . ."  *Montgomery v. DePaul Univ.*, No. 10 C 78, 2012 WL 3903784, at *12 (N.D. Ill. Sept. 7, 2012).  Plaintiff has created a triable question as to whether she was qualified for the Executive I position.  If a jury believes Plaintiff's testimony and finds that she was qualified for the job, Defendant's refusal to rehire her constitutes an adverse employment action.  *Montgomery*, 2012 WL 3903784, at *12.  Plaintiff has met her burden as to the second element of her ADA retaliation claim.

Finally, we consider whether a causal connection exists between her request for an accommodation and Defendant's refusal to rehire her.  First, Defendant does not argue that Plaintiff failed to raise a triable issue concerning a causal connection between the protected activity and the adverse employment action.  (*See* Mem. ISO MSJ at 22 ("Edwards' ADA retaliation claim . . . is redundant to Plaintiff's ADA failure to accommodate claim[15] and fails under the law for the same reasons stated above.").)  Accordingly, Defendant waived this argument.  *D.S.*, 799 F.3d at 800.  Even if Defendant had raised a causal connection argument, we find that Plaintiff has presented sufficient evidence for a jury to find that Defendant did not rehire Plaintiff because of her request for an accommodation.  Plaintiff requested a meeting with an ADA coordinator on her AEP application and was never contacted.  (*See* Def. Ex. 42.) Plaintiff alleged that her doctor sent multiple requests for accommodation to Defendant that were

---

[14] As discussed above in our reasonable accommodation analysis, we find that there is a genuine issue of material fact as to whether Plaintiff requested an accommodation from Defendant.
[15] A failure to accommodate claim does not require a causal connection between engaging in a protected activity and an adverse employment action.  *Reeves ex rel. Reeves*, 759 F.3d at 701.

also ignored.  (Def. SOF ¶ 102.)  We find that a jury could infer retaliation from Defendant's

inaction.  Defendant's motion as to Plaintiff's claim for retaliation under the ADA is denied.

  b. *Plaintiff's Title VII Claims*

Plaintiff also brings clams under Title VII for race and sex discrimination based on

Defendant's failure to rehire her, and she also alleges a hostile work environment claim based on

race.  (Compl. ¶ 45.)  We consider both claims below.

  i. <u>Sex and Race Based Discrimination</u>

Defendant argues that summary judgment is proper on Plaintiff's Title VII discrimination

claims because Plaintiff fails to provide sufficient evidence that she suffered an adverse

employment action or that any action by Defendant was motivated by improper discrimination.

(Mem. ISO MSJ at 7.)

Title VII makes it unlawful for an employer to discharge or discipline an employee

because of that person's race or sex, among other grounds.  42 U.S.C. § 2000e.  As addressed in

our ADA analysis, we now analyze claims of employment discrimination without distinguishing

between direct and indirect evidence.  *Ortiz*, 2016 WL 4411434, at *6.  To survive summary

judgment, Plaintiff must present enough evidence to support a jury inference that she suffered an

adverse employment action because of her race and sex.  *Id*.

  ii. <u>Adverse Employment Action</u>

We first address Defendant's contention that Plaintiff did not prove that she suffered an

adverse employment action.  Plaintiff alleges that Defendant's refusal to reinstate her, her three-

day suspension, and the alteration of her work duties all constitute adverse employment actions

that support a Title VII claim.  (Resp. at 18.)  "Typically, adverse employment actions are

economic injuries."  *Markel v. Bd. of Regents of Univ. of Wis. Sys.*, 276 F.3d 906, 911

(7th Cir. 2002). Plaintiff satisfies the adverse employment action prong if she shows: 1) she was terminated or suspended without pay or her compensation or benefits were severely reduced; (2) she was transferred to a lateral position or her job changed in a way that reduced her career prospects; or (3) her work conditions were changed in a way that lead to undue hardship. *Herrnreiter v. Chi. Hous. Auth.*, 315 F.3d 742, 744 (7th Cir. 2002); *see also Whittaker v. N. Illinois Univ.*, 424 F.3d 640, 647 (7th Cir. 2005) (holding that a three-day suspension without pay constituted an adverse employment action). "[A]n employer's refusal to hire or rehire an applicant is a classic adverse action that, when done on a prohibited basis, violates Title VII." *Montgomery*, 2012 WL 3903784, at *12. However, refusal to rehire an employer who is unable to perform the essential functions of her job does not constitute an adverse employment action. *James v. Hyatt Regency Chi.*, 707 F.3d 775, 782 (7th Cir. 2013); *Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 223 (7th Cir. 2015). "[M]ere inconvenience or an alteration of job responsibilities" is insufficient to show adverse employment action, but "reassignment to a position with significantly different job responsibilities" can constitute adverse employment action. *Pride v. Ill. Dep't of Human Servs.*, No. 12 C 5740, 2014 WL 2208999, at *4 (N.D. Ill. May 28, 2014) (internal citations omitted).

Based on the relevant case law, we find that Plaintiff's three-day suspension and Defendant's alleged failure to rehire Plaintiff after she was cleared by her doctor to return to work with reasonable accommodation[16] constitute adverse employment actions supporting a Title VII claim. *Whittaker*, 424 F.3d at 647; *Montgomery*, 2012 WL 3903784, at *12. Plaintiff's claim that her job duties were altered, on the other hand, is not an adverse employment action; having to lift boxes is not a significant alteration to Plaintiff's employment. *Pride*,

---

[16] Unlike in *James* and *Curti*s, we have previously determined that there is a genuine issue of material fact as to whether Plaintiff was qualified to return to the Executive I position.

2014 WL 2208999, at *4.  We proceed then, by considering whether Plaintiff has shown that her three-day suspension or Defendant's failure to rehire her were due to impermissible sex or race discrimination.

### iii.  Adverse Employment Action Caused by Sex or Race Based Discrimination

We next consider whether Plaintiff has provided sufficient evidence for a jury to infer an improper purpose behind Plaintiff's three-day suspension or Defendant's refusal to rehire her. *Ortiz*, 2016 WL 4411434, at *6.

Plaintiff asserts that Lagattuta's excessive monitoring supports an inference of discrimination.  Lagattuta began documenting Plaintiff's behavior on her first day at IDFPR and also instructed others working in the records room that if anything unusual was going on they should make a note of it.  (Def. SOF ¶ 45.)  Lagattuta brought disciplinary charges against Plaintiff for playing her radio although Lagattuta did not know if supervisors regularly played the radio at work.  (Pl. SOF ¶ 11).  On the whole, Lagattuta brought a total of seven charges of insubordination/disorderly conduct against Plaintiff despite having never brought disciplinary charges against any other employee throughout his career at IDFPR.  (*Id.* ¶ 9)  Plaintiff's union steward, Rocek, testified that in his experience, he had never seen an Executive I supervisor charged in the manner Plaintiff was for sending an email changing records room procedures or for not sitting in her assigned seat, as Plaintiff was.  (Pl. SOF ¶¶ 49–50.)  Generally, Rocek testified that in his experience he had never seen a supervisor disciplined for the type of conduct Plaintiff was disciplined for.  (*Id.* ¶¶ 51–57.)  Plaintiff also testified that she was the only African-American, female supervisor[17][18][19] in the records room.[18][19]  (Resp. at 20.)

---

[17] Plaintiff also argues that two non-African American women, Sadzi Oliva and Charlotte Tybor, were rehired after taking leave.  (Resp. at 214.)  Oliva and Tybor were not on disability leave, though, so we find that they are not proper comparators.  *Good*, 673 F.3d at 675; (*See* Pl. Ex. 7).

Based on the evidence taken as a whole, we find that no reasonable juror could conclude that Defendant failed to rehire Plaintiff based on her sex or race. While Plaintiff presents evidence that Lagattuta treated her differently than other workers, she has failed to connect that treatment to her sex or race. *C.f. Ortiz*, 2016 WL 4411434, at *11 (holding that jury could infer discriminatory animus where plaintiff presented testimony that managers had directed ethnic slurs at plaintiff); *see also Chaib v. Indiana*, 744 F.3d 974, 985 (7th Cir. 2014) ("Finally, even stepping back from the traditional tests into the broader totality-based view recently suggested by this Court . . . because [plaintiff] has also failed to provide sufficient evidence to link any such action to her gender or national origin, this Court affirms the district court's grant of summary judgment."); *Han v. Whole Foods Market Grp., Inc*., 44 F. Supp. 3d 768, 791 (N.D. Ill. 2014). Defendant's motion for summary judgment on Plaintiff's Title VII sex and race discrimination claims is granted.

### iv. Hostile Work Environment Claim

Defendant also asks that we grant judgment in its favor on Plaintiff's Title VII race-based hostile work environment claim.

Title VII implicitly protects an employee from harassment based on race that is either

---

[18] Plaintiff relies on the opinion of Rocek that "because all four of the people in the records room were white[,] they were threatened by Edwards as a black woman being their supervisor." (Pl. SOF ¶ 46.) This is an improper opinion and is inadmissible. *See Fife v. mPhase Tech., Inc*., No. 12 C 9647, 2014 WL 7146212, at *3 (N.D. Ill. Dec. 15, 2014) ("Evidence must be admissible in order for the Court to consider it when determining summary judgment and improper opinion testimony or testimony that does not refer to supporting evidence or provide a foundation for personal knowledge of the facts asserted is improper and should not be relied on by the Court."). We also decline to rely on statements by David Hirschey that lack foundation. *Id*.

[19] In Plaintiff's statement of additional facts, she contends that Lagattuta made a racially discriminatory comment to another African-American woman. We find that Pl. SOF ¶ 1 is not supported by the record so we do not rely on it now. Plaintiff makes a similar assertion in Pl. SOF ¶ 38, citing the deposition of Rocek. We find that Pl. SOF ¶ 38 relies on hearsay and is inadmissible. Fed. R. Evid. 802.

severe or pervasive enough to create a hostile work environment. *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78, 118 S. Ct. 998, 1000 (1998); *Jackson v. Cnty. of Racine*, 474 F.3d 493, 499 (7th Cir. 2007). For an employee to survive summary judgment on a Title VII hostile work environment claim, she must demonstrate that: (1) she was subjected to unwelcome conduct; (2) the conduct was directed at her because of her race; (3) the conduct was severe or pervasive enough to create a hostile work environment; and (4) there is a basis for employer liability. *Roby v. CWI, Inc*., 579 F.3d 779, 784 (7th Cir. 2009). "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S. Ct. 367, 370 (1993); *see Hilt–Dyson v. City of Chi.*, 282 F.3d 456, 462–63 (7th Cir. 2002) (observing that conduct must be so severe as to alter the conditions of employment, isolated incidents do not constitute hostile work environment). In evaluating a hostile work environment claim, a court must consider the "totality of the circumstances, including the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Cerros v. Steel Tech.*, 288 F.3d 1040, 1046 (7th Cir. 2002) (quoting *Harris*, 510 U.S. at 23, 114 S. Ct. at 371); *McKenzie v. Ill. Dep't of Transp*., 92 F.3d 473, 480 (7th Cir. 1996) (holding that three comments over a three month period were not frequent and severe enough to support a hostile work environment claim); *see also Swain v. Cub Foods*, No. 2 C 1093, 2003 WL 22232797, at *3 (N.D. Ill. Sept. 23, 2003) (granting summary judgment on a hostile work environment claim where plaintiff alleged that she was subjected to four offensive comments by co-workers). "Title VII is not a general prophylactic against workplace animus. It is only concerned with animus motivated by certain

protected characteristics." *Hall v. City of Chi.*, 713 F.3d 325, 330 (7th Cir. 2013) (internal

citation omitted); *see also Ezell v Potter*, 400 F.3d 1041, 1049 (7th Cir. 2005) (finding that "rude

and inappropriate" comments, as opposed to racial or ethnic slurs, are not the type of comments

that render a workplace hostile); *Anderson v. Office of Chief Judge of Cir. Ct. of Cook Cnty., Ill.*,

66 F. Supp. 3d 1054, 1066 (N.D. Ill. Sept. 3, 2014) (granting summary judgment on hostile work

environment claim where plaintiff failed to connect her claims of excessive discipline to her

race); *Trachtenbery v. Dep't of Educ. of City of New York*, No. 12 Civ. 7964 (PAE),

2013 WL 1335651, at *9–10 (S.D.N.Y. Apr. 3, 2013) (dismissing hostile work environment

claim where plaintiff alleged that for two years she was subject to excessive scrutiny, received

negative performance evaluations based on scurrilous charges, was placed in a bad office, and

was refused training opportunities). An employer is liable for a hostile work environment when

the employer does not promptly and adequately respond to employee harassment. *Porter v. Erie

Foods Intern., Inc.*, 576 F.3d 629, 636 (7th Cir. 2009) (finding that "a prompt investigation is the

hallmark of a reasonable corrective action") (internal citation omitted); *Sutherland v. Wal-Mart

Stores, Inc*., 632 F.3d 990, 994 (7th Cir. 2011) (holding that employer was not liable for hostile

work environment where employer began investigating the incident the day it received the

complaint by interviewing the parties involved). "In assessing [an employer's] corrective action,

our focus is not whether the perpetrators were punished by the employer, but whether the

employer took reasonable steps to prevent future harm." *Porter*, 576 F.3d at 657 (granting

motion for summary judgment on hostile work environment claim based on a co-worker hanging

a noose at work even though harassment did not cease after it was reported to defendant;

defendant's response on the whole was reasonable).

  Plaintiff cites the Egger "REDRUM" incident along with the various complaints related

to Plaintiff's conduct by temporary workers in the records room as evidence of a hostile work environment.[20]  (Resp. at 23.)  Additionally, Plaintiff argues that Lagattuta's excessive monitoring created a hostile work environment.  (*Id*. at 23.)  While we question whether this alleged conduct is sufficiently severe and pervasive, Plaintiff has presented no evidence that any comments or conduct were racially charged.  Egger informed Lagattuta that the "REDRUM" message was not directed at anyone in particular (Def. SOF ¶ 56), and even assuming that the magnets were a threat directed towards Plaintiff, there is no evidence to suggest that Egger targeted Plaintiff because of her race.  "REDRUM" is not inherently racial and is not a racial slur.  As to Berliant's comments and Lagattuta's monitoring of Plaintiff's conduct, again, there is no evidence that either Berliant or Lagattuta targeted Plaintiff because of her race.  Additionally, Plaintiff has also failed to raise a triable jury issue as to employer liability.  It is undisputed that Defendant investigated the "REDRUM" incident, removed Egger from the records room and met with both Egger and Edwards concerning the incident.  (Def. SOF ¶ 61.)  It is also undisputed that Lagattuta investigated the Berliant allegations.  (*Id*. ¶ 68.)  Accordingly, Plaintiff cannot maintain a claim for hostile work environment.  *Porter*, 576 F.3d at 636; *Sutherland*, 632 F.3d at 994; *Hall*, 713 F.3d at 330.  Defendant's motion as to Plaintiff's Title VII hostile work environment claim is granted.

v.  Title VII Retaliation

Defendant asks that we grant its motion on Plaintiff's Title VII retaliation claim because Plaintiff's threat to file a complaint does not constitute protected activity.  Plaintiff alleges that

---

[20] In her deposition, in support of her hostile work environment claim, Plaintiff states that: "my wages were docked," "my work product was sabotaged by temporary people," and "documents were inserted into my personnel file without any notice."  (Edwards Dep. at 132.)  She does not raise these arguments in her response to Defendant's motion so they are waived.  *De v. City of Chi.*, 912 F. Supp. 2d 709, 733 (N.D. Ill. 2012).

she was retaliated against after threatening to file a complaint with the Illinois Department of Human Rights. (Resp. at 24.)

Like Plaintiff's ADA retaliation claim discussed above, to state a claim for retaliation under Title VII, a plaintiff must allege: "1) that [s]he engaged in a statutorily protected activity; 2) that [s]he suffered an adverse employment action; and 3) that there was a causal link between the protected activity and the employer's action. *Prince*, 73 F. Supp. 3d at 894. An employee engages in a protected activity by either: (1) filing a charge, testifying, assisting or participating in any manner in an investigation, proceeding or hearing under Title VII or other employment statutes; or (2) opposing an unlawful employment practice. Vague and obscure 'complaints' do not constitute protected activity." *Northington v. H & M Int'l*, 712 F.3d 1062, 1065 (7th Cir. 2013). "Merely complaining in general terms of discrimination or harassment, without indicating a connection to a protected class . . . is insufficient [to support a Title VII retaliation claim]." *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006); *Smith v. Lafayette Bank & Trust Co.*, 674 F.3d 655, 658 (N.D. Ill. Mar. 13, 2012) ("In order for Plaintiff's complaints to constitute protected activity, they must include an objection to discrimination on the basis of [race].").

We find that Plaintiff has failed to present sufficient evidence to permit a jury to infer that she engaged in statutorily protected activity.[21] While a threat to file a complaint may constitute protected activity, *Geist v. Glenkirk*, No. 1 C 700, 2001 WL 1268574, at *6 (N.D. Ill. Oct. 23, 2001), Plaintiff has presented no evidence that her race was ever mentioned in the meeting with Lagattuta. On the contrary, Rocek's March 4, 2011 letter describing the

---

[21] In her response to Defendant's motion for summary judgment, she does not allege that Defendant's retaliated against her after filling an EEOC charge. Accordingly, that argument has been waived. *De*, 912 F. Supp. 2d at 733.

meeting with Lagattuta explains that he and Plaintiff raised concerns of job safety and Plaintiff's job duties.  (Pl. Ex. 21 (Dkt. No. 173–3).)  Similarly, in his rebuttal to Plaintiff's pre-discipline hearing, Rocek states that he "attempted to engage Mr. Lagattuta in discussion regarding Ms. Edwards's contractual and safety concerns."  (Def. Ex. 19 (Dkt. No. 144–3) at 2.)  He later explained that he recommended that Plaintiff contact "the Illinois Department of Human Right to enjoin DPR in an action involving DPR's failure to provide Ms. Edwards a safe workplace." (*Id*. at 6.)  Nowhere does Rocek allege that Plaintiff threated suit based on race discrimination. *Tomanovich*, 457 F.3d at 663; *Smith*, 674 F.3d at 658.  Defendant's motion concerning Plaintiff's Title VII retaliation claims is granted.

## CONCLUSION

For the reasons stated above, we deny Defendant's motion for summary judgement as to Plaintiff's ADA failure to accommodate and retaliation claims.  We grant Defendant's motion for summary judgment as to Plaintiff's ADA disability discrimination claim, her Title VII claims, her ADEA claims, and her Rehabilitation Act claims.  It is so ordered.


_____
Honorable Marvin E. Aspen
United States District Judge


Dated:        Chicago, Illinois
              September 22, 2016